## L. A. RAGSDALE v. MERIDIAN LAND & INDUSTRIAL COMPANY ET AL.

1. LAND; CONTRACT OF SALE. *Shortage. Conflicting clauses. Construction.*

    A contract of sale stipulated that a schedule of the several tracts sold and their prices should be the basis of the contract, and that "the money value" of any errors as to title, amount or description should be determined by arbitrators according to the price agreed upon in the schedule, and be deducted from the purchase-price. The deed conveyed a tract of three hundred and twenty acres "less what had been previously sold, leaving remaining about three hundred acres." It was ascertained that sixty acres had been sold instead of twenty, as was thought, thus causing a shortage of forty acres. *Held,* the value of the forty acres shortage is not to be proportioned to the price of the whole tract, treating the whole as of uniform value, but, to give effect to the agreement for arbitration, the shortage is to be distributed among the parcels previously sold, according to their size, and the value of the shortage apportioned to each parcel determined by the average value of each, taking the whole tract to be worth the price agreed on in the schedule.

2. SAME. *Allowance for deficiency. "About, or thereabouts."*

    Said deed provided that where the terms "about, or thereabouts" are used in connection with a definite number of acres, the variance from the number stated should not vary more than four acres, and if there should be a variance to a greater amount, it should be allowed for. *Held,* that if the deficiency exceeded four acres, the entire deficiency should be allowed for, not merely the excess over four acres.

3. SAME. *Construction of instrument. Intent.*

    Where said contract of sale describes a designated quarter section, "less twelve acres more or less sold other parties," the purchaser is not entitled to allowance for a block, or lots therein, merely because the deed abandoned the description by sections, and described the tract by lots and blocks, and listed among those conveyed the block and lots in question, it appearing that it was known to the purchaser, before the contract of sale, that the tract had been platted into lots and blocks, and it further appearing that the blocks and lots previously sold did not exceed twelve acres.

4. SALE OF LAND.   Defect of title.   Right of purchaser.

In addition to the provision of the contract that the title of the lands sold should be verified by examination of the records and other official sources of information as to titles, the deed provided that if the title of any tract be found defective, and the vendor be unable to remove the defect after reasonable notice, the vendee could reconvey it by quitclaim and take credit for the purchase-price.   Held, the purchaser could insist on a perfect record title, and, if it appeared that the vendor held through one not shown by the record to have title, the purchaser could avail of this provision, although no one had asserted an adverse title.

5. SAME.   Defect of title.   Adverse occupancy.

Mere adverse occupancy by a stranger of one of the lots so purchased is not such failure of title as comes within the terms of the contract and authorizes allowance therefor.

6. SAME.   Allowance to vendee.   Taxes paid.

Said purchaser is also entitled to credit for taxes paid by him on lands assessed to the vendor, the title to which proves defective.

7. WITNESS.   Competency.   Estate of decedent.   Code 1892, § 1740.

Rent for a term of years on land, and which, on the death of the lessor, follows the reversion and passes to his devisee, is part of the estate of the decedent within the meaning of § 1740, code 1892, and, in a suit therefor by the assignee of such devisee, the defendant is an incompetent witness to establish an offset which originated in his favor against such deceased lessor during his life-time.

8. SAME.   Incompetency disclosed during trial.   Excluding evidence.

Where the subject-matter of a suit is the estate of a decedent, and the deposition of defendant has been read to establish an offset which he claims accrued after the death of decedent, but, from a view of the whole evidence, it appears that the offset in fact originated in defendant's favor before said death, the deposition should be excluded.

FROM the chancery court of Lauderdale county.

HON. W. T. HOUSTON, Chancellor.

L. A. Ragsdale, Sr., died in December, 1887, the owner of a very large estate, consisting chiefly of lands in and adjacent to the city of Meridian.   By his will, after making a few

bequests, he devised certain lots in Meridian, known as the compress property, to his son, Lewis A. Ragsdale, the appellant, and all the residue of his property he devised jointly and equally to said Lewis A. Ragsdale and a daughter, Mrs. Ella C. Coffee. Lewis A. Ragsdale was named as executor, and qualified as such. Soon afterwards, he formed the purpose of removing from the state, and entered into negotiations with J. C. Lloyd, Thomas H. Woods, J. S. Solomon and others for the sale of his interest in all the estate which had been devised to him by his father. These negotiations culminated in a written contract of sale, dated August 15, 1888, by which L. A. Ragsdale agreed to sell, and Lloyd and his associates agreed to buy, Ragsdale's interest in said lands, and also his interest in the unadministered assets of his father's estate. The price agreed to be paid was $255,675, payable partly in cash and partly in fixed installments. At the time said contract of sale was entered into, the number of acres contained in the several tracts of land bargained for was not known with certainty, nor had the titles been examined, and the contract of sale provided for examination of the titles and for the ascertainment of the exact quantity of land embraced in the tracts sold, and provided that, after this examination and verification, Ragsdale should execute a deed to Lloyd and his associates; but, notwithstanding these stipulations, which were intended to leave no opening for controversy, the examination of the titles and the survey of the tracts sold were not completed at the time when it was agreed the deed should be executed. The deed was nevertheless executed in December, 1888, and recited that it was executed in pursuance of the previous contract of sale, and that the provisions thereof for the allowance of credit on the purchase-price for defects as to the title and quantity of the tract sold should govern the parties. Before the execution of the deed, Lloyd and his associates were incorporated into the Meridian Land & Industrial Company, and the deed was executed to the corporation, which, it was agreed, should

succeed to all the rights and assume all the obligations of the purchasers arising out of the contract.

The land company entered into possession of the lands thus purchased, and received from Ragsdale all the notes and accounts due to the estate, a half-interest in which it had purchased, and proceeded to sell the lands and to collect the debts due the estate. Payments were made to Ragsdale of the purchase-price from time to time, until all the installments were paid except about $50,000.

Among other claims sold to the land company was one for about $14,000, which Lewis A. Ragsdale alleged to be due to him by J. S. Solomon for rent of the Planters' Compress and Warehouse. Solomon denied his liability for this debt, and the contract of sale contained a provision for the determination and adjustment of this controversy, the nature of which is sufficiently stated in the opinion of the court.

This bill was exhibited by the Meridian Land & Industrial Company against Ragsdale and Solomon, alleging against the former that complainant was entitled to certain credits because of shortage in the quantity of certain tracts of land purchased, and because of alleged defects in the title of other tracts, and because of certain debts due the estate, which the bill alleged Ragsdale had collected and appropriated after his sale thereof to complainant. The bill joins Solomon as co-defendant, in order that the defendant might interplead, and that the amount due on the rent claim might be determined, and credit allowed to complainant therefor, if it should be ascertained that Solomon was not liable therefor.

Solomon answered the bill, and made his answer a cross-bill against his co-defendant, Ragsdale; and on the issue as to this indebtedness much testimony was taken, the nature of which and the questions of law arising therefrom being sufficiently stated in the opinion.

It is not necessary to set out all the provisions of the contract and of the deed executed pursuant to it. Those which have given rise to the matters of controversy involved in this.

suit, and which are passed on by the court, sufficiently appear from the opinion. The court below rendered a decree allowing complainant many of the credits claimed by it under the contract, but disallowing others, and from this decree Ragsdale has appealed. The land company has also assigned error to so much of the decree as disallowed credits which it claimed. This statement of the case, taken in connection with the opinion, will be sufficient for an understanding of the questions passed on by the court. ·

*Walker & Hall* and. *H. N. Leach*, for appellant.

1. It was error to decree allowance for forty acres of shortage in the three hundred and twenty acre tract, on the theory that the shortage embraced the most valuable part of the land. The estimate of the price was made without regard to the parcels previously sold. The purchasers knew that these sales had been made, and dealt only with what remained. Ragsdale did not make any warranty, either as to the quantity or the value of the parcels already sold. Lloyd, for himself and his associates, had looked over the land, and both supposed that the tract still unsold amounted to three hundred acres, and the price of all the land sold was fixed at a wholesale rate, and necessarily without any regard to what had been sold and was in the possession of others. Allowance should be made out of the average price agreed upon for the tract. The provision of the schedule relied upon as a basis of the contract has no application here. The extent of the provision that the shortage should be allowed for according to the prices in the schedule, is that the value of an average acre or lot agreed upon as a method of arriving at a trade for the whole of the land shall not be exceeded by the arbitrators, but may be less in determining credits. The values were placed in the schedule for this purpose.

2. It was error to decree allowance of $4,500 for the defect in the title of a one-third interest in the land in section 7, township 6, range 16. For twenty-five or thirty years the

elder Ragsdale held this defective one-third interest undis-
turbed. His title ran back through successive sales during
that time, and the irresistible inference is that deeds had been
executed to prior owners which had not been recorded. The
provisions for verifying titles merely meant that the titles
were to be examined before the deed was made. It cannot
mean that a good title was not to be received unless on rec-
ord. The language of the contract is not that the title must
be of record, but that the title must be verified by an exam-
ination of the record.

It is sufficient if the title be good in law. A title good in
law is just as good unrecorded as recorded, and just as good
if acquired by other legal methods, such as the statute of
limitation or prescription, as if by deed on record.

It was erroneous to allow a credit for one thousand dollars
for the lots and block in the south-west quarter of section 7,
township 6, range 16. This tract had been cut into lots and
blocks before the contract of sale. It is not contended that
the purchasers were misled. They got as much as they con-
tracted for. They only bought one hundred and sixty acres
less twelve acres previously sold, and it is shown that all the
lots and blocks previously sold did not exceed twelve acres.

3. The only proof upon which the court decreed allowance
for lot 5, block 38, was that the purchasers found it in the
adverse possession of Dred Finley. The answer alleges that
the title is good, and there is no proof that it is defective.
This does not come within the provisions of the contract as
to defective titles.

4. It was obviously error to decree any allowance for taxes
paid by the land company, except on lands which were shown
to drop out of the contract.

5. As to the claim of $14,000 against Solomon: If the
deposition of Solomon be excluded, as it should be, there is
no proof to warrant the allowance of this item. We submit
that he was an incompetent witness to establish his account
for repairs against the elder Ragsdale. (Counsel here dis-

cussed the evidence at great length, to show that Solomon was the real lessee of the compress, and that Wolfe was merely nominally so, and that Solomon was therefore liable primarily for the rent; and, further, that he was estopped by the recitals of the contract and the deed, and by his own conduct in connection with the sale, to deny that he was liable for said rent.)

*Fewell & Brahan*, for appellees.

There was an utter failure to show any liability on Solomon's part for the $14,000 rent. He was not proven to have been the assignee of the term, and there was no undertaking on his part to pay the rent. He was not estopped by any thing in the contract to deny his liability. The body of the contract assigns a claim against Fred Wolfe, under the existing lease, to Fred Wolfe. Solomon's name is not mentioned. The schedule refers to the claim as being against Solomon. If Solomon be estopped by the memorandum in the schedule, then Ragsdale must be held estopped by the recital in the body of the contract. The estoppels are balanced; they offset each other.

The value of the forty acres shortage in the three hundred-acre tract was properly determined. It is contended by appellant that it was intended that the value should be taken at the average value of the tract—so many acres at so much per acre. The fact that arbitrators were to be chosen to fix the value of the shortage shows that this was not intended. It was clearly shown that the parcels previously sold were from the most valuable parts of the tract. The real question before the arbitrators and before the court was, if the whole tract be worth so much per acre, what were the lands nearest the railroad and the city and well situated worth? What is the relative value? The parties discussed the quantity of land previously sold, and made their estimate on the idea that the parcels sold embraced only twenty acres; but, to guard against mistake as to this, they provided that the

money value of any mistake as to quantity should be fixed by arbitrators with reference to the price fixed by the schedule. The schedule recites a lumping value, not a price per acre. The proof shows that the lands previously sold created the shortage. They, in fact, embraced the shortage, and, in determining the value of the shortage, it was necessary to consider the value of what had been sold.

The provision, in view of the words " about, or thereabouts," that no notice should be taken of a shortage not exceeding three or four acres, did not mean that three or four acres were to be deducted where the deficiency exceeded that amount. The deed provides that, in the event the variance was greater, it—that is, the whole variance—should be adjusted.

The court properly decreed allowance for block 147 and two lots in block 141. The deed conveys the lands by blocks. And while some lots and blocks are omitted in the deed, these are expressly mentioned and listed. It is not to be presumed that Ragsdale would specifically convey a block of land that he had sold; he does not pretend that a mistake was made. It being conceded that the title of the lots and block is defective, they fall under the provision as to defective titles, and are not within the exception of twelve acres.

The land company was entitled to reconvey and take credit for the land to which it was shown that Ragsdale had not a perfect record title. The contract plainly contemplated that the purchasers should get a perfect record title, not one resting on the statute of limitations or dependent on extrinsic proof. The parties had a right to make such a stipulation, and the intent is unmistakable. The fact that the purchasers reserved the right to reconvey by quitclaim, shows an intent to get a perfect record title. The provision in the deed for a reconveyance was a modification of that in the contract for arbitration as to the money value of defects in title.

*Hamm, Witherspoon & Witherspoon,* for J. S. Solomon, appellee.

1. It is indisputable that Wolfe, not Solomon, was the lessee. The lease itself shows this, and there is no proof that Wolfe ever assigned the lease to Solomon. On the contrary, it is shown that in August, 1888, when the contract of sale was made, Wolfe was still lessee of the compress, and still held possession as such. To hold Solomon liable for the fourteen thousand dollars claimed for rent, it was necessary for complainant to show that he was either the lessee of the compress or that he was the assignee of the lease during the time the claim for rent accrued. See 1 Wood's Landlord & Tenant, 145, 720, 721, 727; Taylor's Landlord & Tenant, § 426; *Harris* v. *Frank,* 52 Miss., 155; *Doty* v. *Heth, Ib.,* 530; *Taylor* v. *Nelson,* 54 *Ib.,* 524; *Patty* v. *Bogle,* 59 *Ib.,* 491.

The witnesses introduced to prove the liability of Solomon failed to show that he was either lessee or assignee of the lease. The extent of the proof was that when Ragsdale sold to the land company he proposed to sell this claim for rent, stating that Solomon, the agent and manager for Wolfe, claimed that it had been paid, or that there were offsets against it. Solomon denied in his answer that he was either lessee or assignee, and the proof having failed to establish that he was, the bill should have been dismissed as to him.

2. Conceding, however, that Solomon was lessee, or the assignee of the lease, we submit that he has proved a set-off for more than the amount of the rent. We submit that the evidence amply supports the claim for repairs. The land company took this claim with full notice that offsets were existing against it. It is not entitled to the favor and protection accorded to purchasers without notice. The agreement between Ragsdale, the lessor, and Wolfe, the lessee, was in substance a payment for the rent for the term in advance. The advances made by Wolfe, and the repairs agreed to be made, more than exceeded the whole rent up to August 15, 1888. A tenant who has paid rent in advance is not liable

for the same to the grantee of the lessor who has no notice of such payment, but such payments are treated rather as advances on account of rent than as actual payment of rent, and constitute an equitable defense to an action for the rent on account of which it was advanced. 2 Wood's Landlord & Tenant, 1026; Taylor's Landlord & Tenant, § 447.

3. It cannot be successfully contended that Solomon was estopped to deny his liability for the rent claim. He had given notice at the time of the sale that the debt would be contested, and, in the contract, the claim is mentioned as one due under the existing lease to Wolfe. It was not until the deed was executed in December following that the claim is mentioned as one against Solomon. We have, then, the case of an estoppel against an estoppel, which sets the matters at large. 2 Am. & Eng. Enc. of L., 25. Estoppels must be certain. It cannot be said that there is certainty where the claim is referred to in one case as against Solomon, and in another as arising under the existing lease to Wolfe, and where there is no evidence that Wolfe had ever assigned the lease. The case lacks the essential elements of estoppel. See *Turnipseed* v. *Hudson*, 50 Miss., 429; *Sulphine* v. *Dunbar*, 55 *Ib.*, 255; *Staton* v. *Bryant*, 55 *Ib.*, 261.

4. Solomon was a competent witness to establish the set-off. He did not acquire the set-off until October 8, 1888, long after the death of the elder Ragsdale, the lessor. Before that he was a competent witness for Wolfe to establish the set-off, and he did not cease to be competent because he acquired the claim from Wolfe. The suit was not against Ragsdale as executor or administrator, but against him individually. Even Wolfe, if he had been sued, would have been competent, but in any view of it Solomon was competent. *Love* v. *Stone*, 56 Miss., 449; *Cole* v. *Gardner*, 67 *Ib.*, 670.

ALEXANDER, Special J., delivered the opinion of the court. It is assigned for error that the decree allowed complain-

ant, the Meridian Land & Industrial Company, a credit of $4,650 on its purchase-notes, because of a deficiency in quantity of a certain tract of land, estimated to contain three hundred acres. In the schedule accompanying the contract of sale, the land conveyed is described as follows: "S. E. $\frac{1}{4}$ of S. W. $\frac{1}{4}$, section 8, T. 6, R. 16, etc., less what has been sold to the railroad and water-works, and others, being in all net about three hundred acres, more or less." The deed executed in pursuance of the contract describes the excepted part as follows: "Except what has been heretofore sold to railroads, to the Meridian water-works and to other parties, leaving remaining a tract of three hundred acres, thereabouts."

The contract contains a provision for the adjustment of controversies such as this, which is as follows:

"It is hereby agreed by and between the parties hereto that the list of real estate prepared by the party of the first part and furnished by him to the parties of the second part is made, and shall be taken to be, the basis on which the contract rests, and said list is to be verified, at the expense of the parties of the second part, by reference to and examination of the deeds of record and other official sources of information touching titles of land in said county. It is further agreed by and between the parties hereto that if, in the verification of the list of realty to which warranty deeds are to be made as hereinbefore provided for, any errors shall be found in said list as to title, amount of land or description or situation of land, the same shall be corrected in conformity to, and in accordance with, the official records of deeds and other official sources of information as to titles of realty; and, where such errors shall be found to exist in said list, then arbitrators shall be chosen in the usual way, one or more by each of the parties hereto, with umpire mutually selected by such arbitrators, if necessary, and these persons shall fix and determine the money values of such errors, in accordance with the price agreed upon by the parties hereto in paper hereto attached marked 'Schedule B,' and the money

value of such errors, so fixed and determined, shall be deducted from the purchase-money hereafter agreed to be paid by the parties of the second part to the party of the first part."

After the execution of the deed, it was ascertained that the quantity of land embraced in the several deeds executed by the elder Ragsdale aggregated about sixty acres, instead of twenty acres, as the parties at the time supposed. Thus, by the terms of the contract, complainant became entitled to a credit because of a shortage of about forty acres. The amount of the credit to be allowed depends upon a construction of the above-quoted clause of the contract. The price of the entire tract, supposed to contain three hundred acres, belonging to Ragsdale, is shown by the schedule "B" to have been $45,000, and, while there is no proof that the land was sold by the acre, it will be seen that the price paid was at the rate of $75 per acre for the half-interest conveyed by Ragsdale to complainant; but, in its bill, complainant claims a credit on the basis of $150 per acre, contending that the parcels which had been sold off were from portions of the tract worth twice as much as the average value of the whole, and this credit was allowed by the court below. No testimony, however, was taken as to the actual or relative value of the specific parcels of land which had been sold. The evidence as to this is general, and to the effect that the lands adjacent to the several railroads and the water-works are higher, more accessible and better located for residences than the remaining portions, and that much of the land lying back from the railroads and water-works is flat and marshy, worth not exceeding $25 an acre. The most that can be said of the evidence is that it fairly establishes that a large, perhaps the larger, portion of the land which had been sold off lies in the most valuable parts of the tract. It is argued by complainant that the shortage is thus shown to lie in the most valuable land; that the parties, knowing the entire tract contained three hundred and twenty acres, estimated

that the previous conveyances did not embrace more than twenty acres, whereas, they conveyed sixty acres, and, therefore, that the situation and value of the shortage must be found in the lands which had been sold.   On the other hand, it is contended for appellant, Ragsdale, that the shortage cannot be assigned to any particular part of the tract; that the previous conveyances, embracing as they did more land than was thought, caused a shortage *in what remained;* that the deficiency cannot be found in the lands previously deeded, but that these deeds were merely the occasion of a shortage in what was supposed to pass by the conveyance to complainant; that the average value of the tract, as shown by the price paid, must be the basis for measuring the value of this deficiency, and that this is the meaning of the stipulation in the contract that the money value of errors in the amount of land shall be determined in accordance with the prices shown in schedule " B."

The solution of this question is not free from difficulty. The intention of the parties must be gathered, if possible, from the language and terms which they have themselves employed.   If we look alone to the language of the schedule descriptive of the land, it would seem that the parties did not deal with any reference to the value of the parcels which had been previously sold, but only with reference to the tract remaining; that the previous conveyances were considered as merely diminishing the quantity of the tract bargained for; and in this view, the value of the shortage would be determinable by the average value of the tract, to be ascertained by reference to the price paid.   The real difficulty arises out of that clause in the contract providing for arbitrators to determine the value of errors as to title, amount, description or situation of land.   The court finds itself called on to do what the contract stipulated should be done by arbitrators, and that is, to determine the money value of such errors in accordance with the price named in the schedule.   It is hardly supposable that the parties would

have provided for a resort to arbitration merely to ascertain
the value of a given number of acres of land at a specified
price per acre.   An arithmetical process so simple would
scarcely be thought to require the combined effort of several
men.   We must rather presume that the parties had in con-
templation the functions usually pertaining to arbitrators,
which are more or less judicial in their nature.   Moreover,
one or more arbitrators were to be chosen by each, and these
were to unite in choosing an umpire.   Their duty was then
the difficult one of determining values.   It is an elementary
rule that a contract must be so construed as to give effect, if
possible, to all its provisions.   We must construe the contract
in question so that the provision for an arbitration shall not
be meaningless.   At the same time, we must give some effect
to the stipulation that the value of the shortage shall be de-
termined in accordance with the price mentioned in the
schedule.   We can accomplish this only by holding that the
relative value of the several parcels which had been sold, as
compared with the value of the entire tract as fixed by the
schedule, must be looked to in determining the value of the
shortage, and the shortage of forty acres must be appor-
tioned to the several tracts which had been sold.   It is ap-
parent that the parties supposed the several previous convey-
ances embraced only twenty acres, whereas, in fact, they
embraced sixty acres; but since it cannot be said that the
parties were mistaken as to any one of these conveyances
rather than another, it must be held that each previous sale
embraced three times as much land as the parties supposed.
The mistake can be corrected only by acting on the idea
that each parcel previously sold contained three times as
much land as it was estimated by the parties to contain.
To illustrate: It was shown that the amount conveyed to
the Warrior Coal Fields Railroad Company was about fifteen
acres.   We must conclude that the parties supposed that this
conveyance did not embrace more than five acres, and thus
ten acres of the forty acres shortage can be found.   The

value of these ten acres must be determined relatively to the value of the whole tract, estimating the latter at $45,000. In other words, the inquiry must be, what was the value on August 15, 1888, of an average ten acres of the smaller parcel, assuming the entire tract to have been worth the price named in the schedule ? By going through with the previous conveyances and apportioning the shortage in this manner, and determining the values in each case by comparison with the agreed value of the whole, we give effect to every provision of the contract.    We allow to the arbitrators room for the exercise of their judgment as to values, and, at the same time, we determine the money value of the error in accordance with the price of the tract as fixed in the schedule.    A careful and protracted study of the question discloses no other method by which all the provisions of the contract can be harmonized and given effect.

We may add that the evidence as to the amount of the shortage in this tract is not entirely satisfactory.    The testimony of Hamilton, the surveyor, shows with certainty the amount of the land embraced in each of the seven previous conveyances by the elder Ragsdale, but on cross-examination he stated that one of the deeds probably embraced four or five acres included also in another, and it seems that the court below found that this was the case.

It is further apparent that the court below, after determining the actual shortage in acres, deducted therefrom four acres because of another provision in the deed, which is as follows :  " It is understood and agreed when the term ' about ' or ' thereabout ' is used in connection with a definite number of acres, the number of acres stated shall not vary from the number named herein by more than three or four acres, and, in the event there is a variance to a greater amount, the same shall be adjusted as provided in said contract of date August 15, 1888, for errors and omissions in description."

The court, if counsel be correct, construed this clause as a

contract that in all cases of shortage in the quantity of land, no account should be taken of four acres; that, even in cases where the deficiency exceeded four acres, that much was to be wholly ignored. This is a misconception of the meaning of the provision. By it the parties merely stipulated that where the shortage in the quantity of land should not exceed three or four acres, no notice should be taken of it. Many large tracts of land were being conveyed, and the number of acres was not in every case known. It was agreed that if the deficiency in any tract should not exceed the comparatively insignificant amount stated, it should be passed by as a matter too small for notice. But if the shortage exceeded this maximum limit, and thus became a matter to be noticed —a variance calling for adjustment—the full amount of the shortage or variance was to be taken into account and allowed for.

Among other lands described in the schedules to the contract of August 15, 1888, was a tract described as S. W. ¼ of section 7, township 6, range 16 west, in Lauderdale county, " except twelve acres, more or less, already sold other parties." Prior to that time, this tract had been platted into blocks and lots, and some of these had been sold. But the deed executed in pursuance of the contract abandoned the description by section, township and range, and conveyed the tract by blocks and lots, and recited that blocks 122 to 163, inclusive, in Ragsdale's survey, were situated in the S. W. ¼ of section 7, township 6, range 16 west. A number of these lots and blocks are omitted in the deed, presumably because it had been ascertained that they had been sold, and were embraced within the exception of twelve acres. Blocks 141 and 147, however, were not omitted, but appear listed with the other blocks going to make up that part of the quarter-section conveyed by the deed. The bill alleges that block 147 and two lots in block 141 had been previously conveyed, and were owned by other parties, but does not allege that these, added to other lots previously conveyed, exceeded twelve acres.

On the other hand, the evidence shows that the complainant got one hundred and forty-eight acres in the quarter-section. It is, nevertheless, argued that because these lots were, among others, expressly mentioned in the deed, they cannot form part of the twelve acres excepted. We cannot assent to this view, but hold it was error to allow these credits. There is nothing showing that the parties intended to abandon the provisions of the contract. On the contrary, it is carried forward as a part of the deed by express provision, and it declares that the list of property embraced in schedule "A" is to be referred to as furnishing the information upon which the parties act in making the contract. The description by lots and blocks, employed in the deed, was merely another method of describing the lands, and was adopted, doubtless, as a matter of convenience. It was known before the contract was signed that the tract had been platted, and that lots and blocks to the amount of about twelve acres had been sold. If the same description employed in the contract had been used in the deed, and it had been discovered that these lots or blocks had been previously sold, surely it would not be contended that the purchasers were entitled to a credit for them if the aggregate of the lots and blocks sold did not exceed twelve acres. Yet, in that case, there would have been a description embracing these lots and this block as effectually as the description employed in the deed. The purchasers got what they bargained for—the entire quarter-section, less about twelve acres—and cannot now be heard to complain.

The appellee claimed and was allowed a credit of $4,500 because of an alleged failure of title to an undivided one-third interest in the E. ½ of the N. W. ¼ and the N. W. ¼ of N. W. ¼ and W. ½ of the N. E. ¼, section 7, township 6, range 16 east, and appellant assigns this for error. In addition to the provisions of the contract relative to defective titles, and as supplemental thereto, the deed contains the stipulation that " if the title to any of the above-described property be found

defective, and the party of the first part be unable to re-
move the same after reasonable notice, then such property
is to be quitclaimed to the party of the first part, and the
said party of the second part shall thereupon be entitled to
a credit by the purchase-price thereof on the purchase-
money notes, as provided in said contract of date August 15,
1888." The court decreed that complainant reconvey by
quitclaim to Ragsdale his one-half interest in an undivided
one-third of this land, and that it take credit for a propor-
tionate part of the purchase-price. There is no dispute as
to the facts. It is agreed that the deraignment of title of
this and all other land in controversy is correctly set out in
the answer of Ragsdale. The abstract therein shows that
the chain of title as to this undivided one-third interest is
defective, and that Ragsdale holds under a remote grantor
not shown by the record to have any title. The answer ad-
mits that there is a missing link, but seeks to overcome the
effect of this by alleging that for more than twenty years no
one has asserted any title adverse to the title of the said L.
A. Ragsdale. This is insufficient as an averment of title by
adverse possession. But we think that, under the stipula-
tions of the contract and the deed, complainant can insist on
a perfect *record* title. Its object in buying the land was to
resell, and this was doubtless well known to Ragsdale. It
had the right to contract for a perfect record title and for
reconveyance if the records failed to disclose such title. We
think this intent clearly appears on the face of the contract
and deed, and therefore concur with the court below in hold-
ing this item to be a proper credit.

· The land company has assigned for error that the court
did not direct a reconveyance of all of Ragsdale's interest
in this tract, contending that the failure of the record title
as to an undivided interest in what he sold entitled it, under
the provision of the deed above quoted, to reconvey all the
tract, and take credit for the entire purchase-money. It is
sufficient, as to this, to say that no foundation is laid in the

bill for a credit greater than that allowed. The bill alleges a failure of title to the undivided one-third interest, and asks credit for one-third of the purchase-price. It is true a paper appears copied into the record, purporting to be an amendment to the prayer of the bill, asking for the increased credit here sought, but that paper does not appear to have been filed, or answered by defendant, or regarded in any way by the court, and we decline to notice it.

Among the credits allowed in the decree, and brought in question by an assignment of error, is one for $150, because of the failure of title to lot 5, block 38, Ragsdale's survey. There was not sufficient evidence to warrant this allowance. The extent of the evidence is that the purchasers found this lot in the possession of one Dred Finlay, who claimed ownership. It devolved upon the complainant to show a failure of title in their grantor, and it was not sufficient merely to show adverse occupancy by a stranger.

It is further assigned for error by appellant that the court allowed complainant credit for taxes paid by it on lands falling out under terms of the contract. It is not clear from the evidence what lands were paid on, and there is nothing to show how the lands were assessed or why complainant paid the taxes. If taxes were assessed to Ragsdale and paid by complainant on land which it purchased, but the title to which failed, it should have credit therefor. But if any of the land embraced in its purchase had been previously sold to others and assessed to such others, there was no necessity for the land company to pay the taxes, and, if it did so, it cannot charge them against Ragsdale. As the cause will be remanded, it can be readily ascertained what taxes due on lands assessed to Ragsdale, and falling out under the contract, were paid by complainant.

The next and only remaining question presented by the record arises out of the assignment of Lewis A. Ragsdale of an indebtedness of about $14,000 alleged to be due to him for rent of the Planters' Compress and Warehouse, this be-

ing the rent accrued after the death of his father and up to
the date of the contract of sale, August 15, 1888.   This prop-
erty was owned by the elder Ragsdale, who devised it to
Lewis Ragsdale free from all debts and charges of every
kind.   By the said contract of August 15, 1888, this claim
was, among others, sold to Lloyd and his associates, and
passed by the deed to complainant.   The contract, after de-
scribing the compress lots and improvements which were
embraced in the sale, adds: " Together with all money now
due on said compress to the party of the first part, under the
existing lease thereon to Fred Wolfe, amounting to $14,000,
which is hereby agreed to set over and transfer to said par-
ties of the second part by the party of the first part ; and if
the lessee of said compress or Mrs. Ella C. Coffee shall con-
test said claim of $14,000, and the same, or any part of the
same, shall be determined adversely by the courts to the par-
ties to this contract, after litigation conducted under the
direction of the party of the first part, then the party of the
first part shall make good the whole or any part of said
$14,000 so determined not to be due by said lessee to the
party of first part."   In the schedule of property attached
to the contract, this claim is listed as "Account against J. S.
Solomon, $14,000."   This bill of the Meridian Land .& In-
dustrial Company, which seeks an accounting with Rags-
dale, joins Solomon as a co-defendant, in order that the de-
fendants may interplead, and that the amount due on this
rent claim, if any, may be determined, and the rights of the
complainant arising out of the above-quoted provision of the
contract be ascertained and enforced.   Solomon answered
the bill, and made his answer a cross-bill against his co-de-
fendant, Ragsdale.   The latter demurred to the cross-bill,
and, the demurrer being overruled, answered, and thus the
issue as to this indebtedness was fairly presented to the
court.

The defense asserted by Solomon is twofold.   (1) That he
never became the lessee or the assignee of the term, or in

any way liable to pay the rent; and (2) that, if liable for the rent, he has acquired by purchase from Wolfe, the lessee, a debt amounting to $6,546.08, the balance due by the estate of Ragsdale, deceased, to Wolfe, for money advanced, and also an account for about $13,000, due by said estate, to Wolfe for permanent repairs placed on the compress property. Both of these debts, it is alleged, the elder Ragsdale was obligated by the terms of his lease to pay, and are just off-sets against the demand for rent. On the other hand, it is insist⁀d by Ragsdale that, while Wolfe was nominally the lessee of the compress, Solomon was, in fact, lessee or the assignee of the term, and, if not technically the lessee, that he is estopped, as against complainant and respondent, Rags-dale, to deny that he was such lessee or assignee, and conse-quently liable for the rent. The answer of Ragsdale further denies that the estate of his father was liable for the claim for repairs asserted by Solomon, and also denies the correct-ness of the account therefor.

The compress was leased August 15, 1881, to Fred Wolfe, for a term of ten years, at an annual rental of $7,500. Con-temporaneously with the lease, Wolfe advanced to said Ragsdale $32,000. Ragsdale was also indebted to him on another account for $4,000. It was stipulated in the lease that $6,000 of the rent each year should be applied to the re-payment of the amount so advanced, and $1,500 should be applied each year to the payment of the $4,000 debt until it should be paid, after which that amount was to be paid an-nually in cash to Ragsdale. The lease further provided that Ragsdale should, during the term, "make all repairs to said warehouse of a permanent nature—that is to say, all repairs necessary to keep said building in its present condition, not including the repairs made necessary by the use of said prop-erty." Wolfe agreed to use the machinery in a proper man-ner, employing proper persons to manage it, and to return the same in as good condition as it then was, " ordinary wear and tear, unavoidable casualty and destruction by fire excepted."

Wolfe resided outside of this state, and in 1882 Solomon took charge of the compress for him, acting under a formal power of attorney from Wolfe, which authorized him, Solomon, to represent Wolfe generally as to all his interests in the compress, in certain mills and a certain bank in Meridian. About that time, Wolfe became financially embarrassed, and suits for large amounts were brought against him, his creditors seeking, among other things, to reach his interest in this compress property.   These efforts, we must assume, were unsuccessful, as Solomon has remained in undisturbed possession and control.   The elder Ragsdale died in December, 1886, and, up to that time, the rents appropriable under the rent contract to the debt of $32,000, left due thereon the sum of $6,546.08, and this balance was by Solomon probated as a claim against the estate.   It was shown that Wolfe was rarely ever in the state, and it does not appear that he devoted any attention whatever to the affairs of the compress. It is not shown that Solomon, as manager, kept any accounts with Wolfe, or ever dealt with him as his principal.   Solomon testifies that he was to receive as his salary a portion of the profits, but what proportion is not stated, nor is it shown that he ever accounted with Wolfe therefor.   It is shown that Solomon, some time before the death of Ragsdale, leased and operated in his own name one, and perhaps two, other warehouses.   Printed letter-heads, used by Solomon during the years 1884 and 1885 in connection with the compress business, were exhibited, and in these his name appears as lessee of the Planters' Compress.   It was further shown that in 1884, a written contract was made between Solomon and one McMillan, as superintendent of the compress, and in this Wolfe and Solomon are several times referred to as the lessees, and the signature to the contract, affixed by Solomon, is "Wolfe & Solomon, lessees."

In the published directory of Meridian for 1888 Solomon was advertised as proprietor and lessee of the Planters' Compress.   Although Solomon does not claim to have acquired,

prior to October, 1888, any debt due by the elder Ragsdale to Wolfe, yet it is shown that he asserted and probated the above-mentioned claim for the balance due for advances. Moreover, Solomon was one of the parties to the contract with Lewis Ragsdale of August 15, 1888, and, along with Lloyd and others, took an active interest in the negotiations leading to that purchase, and, with his associates, signed the contract, the schedule of which recited the rent claim of $14,000 to be due by Solomon.   It is shown by the testimony of Lloyd and Robinson, the associates of Solomon in that purchase, that he knew that the claim here asserted against him was being purchased, and that he did not deny that he was lessee or liable for this claim, but merely asserted that he held offsets against it.   Thus matters stood until October 8, 1888, when Solomon claims to have purchased from Wolfe all the profits to which the latter was entitled arising out of the business of the Planters' Compress Company, together with all claims outstanding and due to Wolfe as lessee thereof.   Solomon exhibited a receipt for $7,000 signed by Wolfe, reciting this purchase, and stipulating that Solomon might sue in the name of Wolfe for any sums due to the compress, holding Wolfe harmless as against any costs or damages. The receipt further stipulated that, until its expiration, the lease should remain intact in the name of Wolfe. Solomon testifies that in this purchase of the profits he understood that he was to assume all the liabilities of the compress.   It was not shown how or when the $7,000 mentioned in the receipt was paid, and Wolfe was not examined as a witness.   After making the contract of purchase with Ragsdale, Lloyd and his associates procured a charter, and were incorporated under the name of the " Meridian Land & Industrial Company," and Solomon was made a director, and it is shown that when the land company took charge of the compress under its purchase, Solomon made certain advances to the company as against the rents to accrue, although he claimed this large repair account as against such rents.   Notwithstanding the

positive testimony of Solomon that during all this time he remained the mere agent of Wolfe, we are constrained by the evidence to hold that he was the real lessee, or the assignee of the term; and, even if he were not, his acts and admissions would estop him, as against the complainant and Lewis Ragsdale, to deny his liability for the rent here demanded. The court below correctly held that he was liable for the $14,000 rent claim.

This brings us to the consideration of the claims asserted by Solomon as offsets. It is not contradicted that at the time of the death of Ragsdale, the lessor, there was still due, of the $32,000 advanced to him by Wolfe, the sum of $6,546.08. By the terms of the lease this was a charge in favor of the lessee against the rents to become due until the amount advanced should be paid by the annual rentals. Moreover, when the contract of August 15, 1888, was made, this balance was treated by the parties to it as a debt due by the Ragsdale estate to Solomon, and it was expressly provided that the purchasers should discharge it. It matters not, therefore, how or when Solomon acquired this account; it was a proper offset against the rent claim.

When we come to consider the claim for repairs, we are confronted with a question of more difficulty. The deposition of Solomon was taken and read in his own behalf to establish the correctness of this account, and a motion was made to exclude the deposition because he was testifying to establish his own claim against the estate of a deceased person, which originated during the life-time of the latter. Code 1892, § 1740. The court reserved action on the motion until the final hearing, and from the fact that decree gave Solomon the benefit of the claim, it is apparent that the court held him to be competent. Whether he was competent or not must depend, in the first place, on whether the estate of Ragsdale is the subject-matter of this litigation (*Love* v. *Stone*, 56 Miss., 449; *Jackson* v. *Smith*, 68 *Ib.*, 53), and on the further inquiry whether the offset sought to be

established by his testimony originated in his favor during the life-time of Ragsdale.

If the rent-claim here asserted by complainant be part of the estate of Ragsdale, although acquired after his death by complainant from Lewis Ragsdale, the devisee of the compress property, Solomon is incompetent as a witness to establish in his own favor a counter-claim arising out of dealings by him with the deceased.

That the rent-claim is part of the estate, we entertain no doubt. Before the death of Ragsdale, the rent for the term was due to him as lessor. On his death, the rent for subsequent years followed the reversion, and passed to Lewis Ragsdale, as devisee of the compress property, and from him by assignment to complainant. It is clear, therefore, that the subject-matter of this branch of the litigation is part of the estate of a deceased person. Notwithstanding this, if, prior to the death of Ragsdale, the claim for repairs here asserted as an off-set existed only as an account in favor of Wolfe, then Wolfe would be incompetent, but the subsequent purchase of it by Solomon would not render the latter incompetent to testify as to its correctness. But if the evidence establishes that Solomon, prior to the death of Ragsdale, was in fact lessee or assignee of the term, then the claim, under the covenants of the lease, originated in his favor during the life-time of Ragsdale, and he must be held an incompetent witness.

Whether the claim originated in favor of Solomon before or after the death of Ragsdale can only be determined by a view of the whole evidence touching this branch of the case. We thus have presented a case without precedent in this state, where the competency of a witness under this statute, usually a preliminary inquiry, is determinable only after considering all the evidence, his own included. When the deposition was offered, Solomon was *prima facie* competent, for he denied that he was lessee or assignee of the term, and denied that he had acquired any interest in the repair account

before the death of Ragsdale, and the lease on its face being in the name of Wolfe, strengthened this presumption. Not until all the evidence was submitted, could the relation of Solomon under the lease be certainly known. Under the law as it formerly existed, which made incompetent a witness interested in the suit, it was held that if the interest was not disclosed on the *voir dire*, the testimony should be excluded, if the interest of the witness was made to appear at any time during the trial. *Carter* v. *Graves*, 6 How., 9, citing Starkie on Ev., 122; Roscoe on Ev., 80. The rule is equally applicable here.

We have already held that the history of the transaction shows Solomon to have been all along the real lessee or the assignee of the term, and this attitude he occupied anterior to the death of Ragsdale. Whatever claim he has for repairs originated in his favor during the life-time of Ragsdale, and therefore he is not competent as a witness to establish the correctness of the account.

We do not think Solomon acquired any additional rights by his alleged purchase from Wolfe in October, 1888. This was after the sale by Lewis Ragsdale to himself and his associates, and after it was known that the land company would sue on the rent-claim. It seems very probable that taking of that receipt was merely to prepare a defense against the expected suit. It carefully secured to Solomon all the benefits of every kind under the lease, reserving to Wolfe only the name of lessee. It was tantamount to an assignment of the term, and, in equity, would doubtless be so treated; but we hold that it conferred no new rights, and that it is merely evidential of a relation previously existing.

The testimony in the record, exclusive of that of Solomon, is not sufficient to prove the correctness of the repair account. Under the circumstances, we will not pass upon it finally, but, as the case will be remanded, will afford Solomon a further opportunity to prove the account, if possible, by evidence other than his own.

As to all the other errors assigned, both by appellant and by appellee, we hold them not well taken, and, except in the particulars above specified, we approve the decree.

*Reversed and remanded.*

JUDGE WOODS, being disqualified by reason of interest, C. H. ALEXANDER, ESQ., a member of the bar, was, by the governor, appointed and commissioned to sit in his place in the hearing and decision of the cause.